UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS KEEN, | ) |
| Plaintiff | ) ) ) |
| v. | ) ) |
| BOOKING HOLDINGS, INC. d/b/a PRICELINE, PRICELINE.COM, LLC, and PRICELINE PARTNER SOLUTIONS, USA, Inc. | ) ) ) ) |
| Defendants | ) ) ) |

## **COMPLAINT AND JURY DEMAND**

### **PARTIES**

1. Plaintiff, Thomas Keen ("Keen" or "Plaintiff") is an individual residing in Foxborough, Norfolk County, Massachusetts.

2. Defendant, Booking Holdings, Inc., d/b/a Priceline, is a corporation with a principal address at 800 Connecticut Avenue, Norwalk, Connecticut.

3. Priceline.com, LLC, d/b/a Priceline, is a Delaware Limited Liability Company with a principal address at 800 Connecticut Avenue, Norwalk, Connecticut.

4. Priceline Partner Solutions, USA, Inc., d/b/a Priceline, is a corporation with a principal address at 800 Connecticut Avenue, Norwalk, Connecticut.

5. Booking Holdings, Inc., Priceline.com, LLC and Priceline Partner Solutions, USA, Inc. all d/b/a Priceline, shall collectively be referred to herein as "Priceline" or "Defendant".

### **JURISDICTION**

1

6. This Court has jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1332.

7. This Court has personal jurisdiction over the Defendant because the acts complained of and harm occurred in Massachusetts.

**FACTS**

8. Keen held the position of Senior Vice President Platform and Technology at Texas-based company Getaroom, Inc. ("GAR"), commencing his employment with GAR in or about January, 2021.

9. GAR operated a business to business hotel booking distributor and operated by providing a simplified solution to the global distribution of hotels to offer the consumer via Affiliates.

10. Priceline is also in the business of providing distribution of hotel offerings to consumers and also had a business to business component which sold to consumers via Affiliates.

11. In or about December 2021, GAR was purchased by Priceline wherein Priceline acquired GAR and its associated technology and folded GAR into Priceline's business to business unit.

12. In connection with this acquisition, GAR was absorbed into Priceline's brand name and ceased operations under GAR and instead operated under the name of Priceline.

13. As part of this purchase, Priceline made clear its intention to retain certain executives of GAR, including Keen.

14. Priceline represented to Keen that it desired to retain him because of the critical nature of the work GAR was delivering to Priceline and because of the position and knowledge Keen had in his position at GAR.

15. In connection with retaining Keen, Priceline prepared a December 30, 2021 Retention Agreement, which Keen executed on January 4, 2022 ("the Retention Agreement"). The Retention Agreement is attached at Exhibit A.

16. The Retention Agreement provided that a Retention Award was being offered to Keen "to encourage [Keen] to remain with [Priceline]" after the acquisition of GAR by Priceline. *See* Ex. A.

17. The Retention Award provided that Keen would be paid in three equal installments of $200,000.00, commencing one year from the closing date of the GAR-Priceline transaction, followed by the second year and third year anniversaries of this date. *See* Ex. A.

18. The purpose of the Retention Award was to entice and incentivize Keen to stay at Priceline after it had acquired GAR. *See* Ex. A.

19. Payment of the Retention Award annually was contingent upon Keen executing a non-solicit/ non-compete agreement, and upon being an active, full-time employee of Priceline at the time payments were due under the Retention Agreement. *See* Ex. A.

20. Keen executed the non-solicit/ non-compete agreement thereby meeting this contingency of the Retention Agreement.

21. Good faith and fair dealing by both Keen and Priceline was implied within the Retention Award agreement.

22. Keen's obligation under the Retention Award agreement was to remain employed by Priceline, i.e. not to resign or be terminated for cause, an obligation Keen fully met.

23. It was implied and required by the covenant of good faith and fair dealing under the Retention Award agreement that Priceline would not terminate Keen on any unlawful basis or without cause.

24. It was implied and required by the covenant of good faith and fair dealing under the Retention Award agreement that Priceline would not terminate for the purpose of avoiding payment of the full Retention Award amounts and thus being unjustly enriched by both retaining Keen as an employee after its purchase of GAR and keeping for itself the Retention Award amounts.

25. The Retention Agreement states that Keen had a "critical role" at Priceline. *See* Ex. A.

26. Keen also received certain Restricted Stock Units ("RSU"), salary, benefits, and accrued paid time off as part of his compensation package offered by Priceline.

27. Priceline additionally provided its February 21, 2018 Selective Disclosure Policy ("SDP") to Keen and required adherence to the policy. The Selective Disclosure Policy applied to officers, directors and employees and covered disclosure of non-public material.

28. The SDP limited the disclosure of non-public material except in certain circumstances such as when that information is required to be disclosed to governmental entities.

29. Keen continued in his employment at Priceline following execution of the Retention Agreement and conducted his duties at Priceline meeting Priceline's expectations and requirements and received positive feedback.

30. At no time did Keen resign from or abandon his employment with Priceline.

31. Keen met all of his obligation conditions precedent to receipt of the Retention Award agreement amounts.

32. During 2022 and 2023, Keen raised a concern regarding certain fees that were hidden from the end-use consumer when viewing hotel offerings on Priceline's Affiliate's website, and raised this issue internally.

33. Keen continued to raise this issue internally but it was not addressed by Priceline.

34. In or about January of 2023, Keen learned that that certain State Attorney Generals were investigating Priceline relative to price presentation on the online website interfacing with the consumer.

35. In sum, the issue that Keen raised concern about he understood were to be part of State Attorney General's investigation.

36. Keen cooperated with the Attorney General's investigation as required by law.

37. Priceline was dissatisfied with Keen's willingness to cooperate with the Attorney General's investigation.

38. In or about April of 2023, Priceline received a subpoena to testify to the State Attorney General of Texas in or about June 2023.

39. In or around April 2023, Keen learned about the subpoena, and that it was his specific position that would be designated to be deposed.

40. A date was set for the deposition to occur in June of 2023.

41. Shortly after learning of this deposition and approximately one month prior to the deposition taking place, Keen was advised that he was being terminated from Priceline with termination to be effective May 16, 2023.

42. Priceline terminated Keen on May 16, 2023.

43. On best information and belief, Priceline did not want Keen to testify pursuant to the subpoena.

44. If Keen was no longer employed by Priceline, Keen would not be designated to testify.

45. Additionally, as of the termination date of May 16, 2023, Keen had accrued certain paid time off ("PTO") under the accrual policy of Priceline, however Priceline did not pay this amount upon his termination.

46. Priceline also failed to render Keen's final paycheck in a timely manner, thereby depriving him of payment of his full wages upon his termination.

47. Priceline also failed to issue payment to Keen for expense reimbursements, or for accrued vacation time in a timely manner.

48. Priceline further did not pay the Retention Bonus under the Retention Agreement or any other form of bonus.

49. Priceline further did not honor certain RSU's to be awarded upon Keen's separation.

50. On best information and belief, Priceline continues to be subjected to investigations by the State of Texas, which filed suit via the Attorney General in or about August 2023.

51. As a result of failure to pay compensation when due and owing, Keen has suffered damages.

52. As a result of being terminated to prevent Keen being designated to testify and fully cooperate with the Attorney General's investigation, Keen has suffered damages.

53. As a result of being terminated to avoid Priceline's obligations to pay Keen the Retention Award amounts, Keen has suffered damages.

## COUNT I

(Nonpayment of Wages, M.G.L. c. 149, §§ 148, 150)

54. Keen restates the allegations set forth above.

55. At all times relevant to the events described herein, Priceline was the employer of Keen including at the time of termination from employment.

56. Keen was entitled to receive certain wages, benefits, equity, and retention and other bonuses and compensation after termination from Priceline which was earned and/or PTO time that was accrued.

57. Priceline failed to pay the accrued PTO, salary, and RSU earned and owed upon his termination from employment.

58. Priceline additionally wrongfully terminated Keen and therefore wrongfully withheld payment of the Retention Award within the Retention Agreement.

59. The Retention Award is effectively an earned bonus, which is calculatable, and therefore a wage under the Massachusetts Wage Act.

60. Keen has been harmed as a direct result of these actions and Priceline is liable for treble damages, attorney's fees, and costs.

## COUNT II

### (Wrongful Discharge in Violation of Public Policy)

61. Keen restates the allegations set forth above.

62. Keen's participation and cooperation in a deposition and/or investigation by States Attorney Generals is a public deed, and also an act which is required by law.

63. The Retention Agreement permitted an exception to disclosure of any information in the event of being sought to testify.

64. Priceline terminated Keen knowing how Keen would testify would be harmful to Priceline.

65. Keen's termination was in violation of the public-policy exception to at-will employment.

66. Keen has suffered damages as a result of Priceline's wrongful termination of employment including lost wages and emotional distress.

67. Keen has satisfied all administrative filing prerequisites by filing a complaint of wage violations with the Massachusetts Attorney General's Office and receiving notices of his right to pursue this private civil action.

## COUNT III

### (Breach of Contract and the Covenant of Good Faith and Fair Dealing)

68. Plaintiff restates, realleges, and incorporates by reference herein all allegations contained in the preceding paragraphs as if recited in full herein.

69. Keen and all Priceline entered into an employment agreement in December 2021 and renewed the agreement with a Retention Award Agreement in December 2021 (executed in January 2022).

70. By meeting performance expectations, remaining employed with Priceline, and fully and faithfully executing the duties of his position, Keen satisfied all conditions precedent necessary to receive all benefits of his employment and Retention Award agreements with Priceline including for performance and retention bonuses.

71. Priceline intentionally deprived Keen of the benefits of the employment agreement and the Retention Award agreement.

72. Priceline intentionally deprived Keen of the benefits of the employment agreement and the Retention Award agreement by discharging Keen from employment in order to avoid paying Keen retention bonuses and performance bonuses.

73. Priceline intentionally deprived Keen of the benefits of the employment agreement and the Retention Award agreement by discharging Keen from employment in whole or in part because of his cooperation with the Attorney General's investigation and/or to avoid and prevent his ongoing cooperation with the Attorney General's investigation.

74. Priceline terminated Keen's employment in May 2023 without good cause, which resulted in Priceline's deprivation of compensation to Keen for performance and retention bonuses earned, which resulted in windfall to Priceline.

75. Priceline acted in bad faith in terminating Keen's employment to avoid payment of performance and retention bonuses earned, which resulted in windfall to Priceline.

76. Priceline's bad faith termination of Keen's employment to avoid payment of performance and retention bonuses earned resulted in an unearned windfall to Priceline.

77. In terminating Keen's employment, Priceline acted with intent to deprive Keen of benefits earned but not received.

78. In terminating Keen's employment without good cause, Priceline improperly denied Keen future payment for past services.

79. Priceline's actions were intentionally unfair and deceptive.

80. Priceline acted unreasonably and in bad faith.

81. As a direct cause and result of Priceline's breach of contract and the covenant of good faith and fair dealing, Keen has sustained suffered great economic harm and has lost the benefits of the agreements he made with Priceline, including but not limited to lost performance and retention bonuses earned, and other benefits.

## PRAYERS FOR RELIEF

WHEREFORE, Keen respectfully demands relief as follows:

A. Adjudge the Defendant liable on all counts;

B. Award all wages and compensatory damages (including but not limited to amount of wages, vacation pay, expense reimbursements, RSU's, performance bonuses, and Retention Award bonuses) according to law;

C. Award triple the amount of wages, vacation pay, expense reimbursements, RSU's, performance bonuses, and Retention Award bonuses;

D. Award interest as required under statutory law;

E. Award reasonable attorney's fees and costs; and

F. Grant any such additional relief as this Court deems reasonable and proper.

## JURY DEMAND

Plaintiff requests trial by jury on all counts.

Plaintiff,

By his Attorneys,

*/s/ Sol J. Cohen*
Sol J. Cohen, Esq.
BBO # 630776
Kerstein, Coren & Lichtenstein, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
(781) 997-1600
EMAIL:  scohen@kcl-law.com

# EXHIBIT A

# priceline

December 30, 2021

Dear Thomas Keen,

We are thrilled to welcome you to the Priceline team and look forward to your continued meaningful contributions as we move forward to build an even more compelling business.

Given the mission critical nature of the work that Getaroom is delivering, we want to encourage you to remain with the Company. To this end, we are offering you a special retention award ("Retention Award"). The Retention Award will be paid to you in three equal installments (each, an "Installment"), paid as of the below Installment dates:
1. One year anniversary of the closing date of the GAR-Priceline transaction ("Closing Date")
2. Second year anniversary of the Closing Date
3. Third year anniversary of the Closing Date

Each Installment will be paid on the same cycle as Priceline's regular payroll schedule, coinciding with the next pay cycle after each given date. Each installment will be equal in value to **$200,000** less all applicable taxes and withholdings.

The Retention Award is contingent upon you signing this retention agreement below, the attached non-solicit / non-compete agreement, and your continued employment by Priceline. To receive each Installment of your Retention Award, you must be an active, full-time employee of Priceline in an eligible position on the date for which that Installment is due.

You will be playing a critical role at Priceline. Your continued service and commitment to our Company is deeply appreciated, and we look forward to the future with you on our team.

Sincerely,

*Liz Dente*
Liz Dente
Chief People Officer

I have read and acknowledged acceptance of the terms detailed above:

*Thomas Keen*                                    1/4/2022
_____    _____
Name   Thomas Keen                                Date


Initials GAR Leader   MSD

**Non-Competition and Non-Solicitation Agreement**

This Non-Competition and Non-Solicitation Agreement (the "Agreement") is dated **December 30, 2021** by and between PRICELINE.COM, LLC, which as used in this Agreement shall include its parents, affiliates, subsidiaries, related and acquired companies, its and their past, present and future officers, directors, employees, trustees, agents, representatives, predecessors, successors and assigns (hereinafter collectively referred to as ("Priceline.com" or the "Company"), and **Thomas Keen,** which as used in this Agreement shall include his heirs, administrators, representatives, executors, legatees, successors, attorneys, agents and assigns (hereinafter "Employee").

The parties, intending to be legally bound, agree as follows:
1. ACKNOWLEDGEMENTS
    (a)    The Employee acknowledges that the Company (as defined below) has expended and shall continue to expend substantial amounts of time, money and effort to develop business strategies, employee and customer relationships and goodwill, and to build an effective organization.  The Employee acknowledges that the Company has a legitimate business interest in protecting such efforts.  The Employee also acknowledges and agrees that in the performance of the duties and responsibilities of employment, the Employee has and will become familiar with the Company's confidential information, including trade secrets, and that the Employee's services are of special, unique and extraordinary value to the Company.  Further, the Employee acknowledges that the Company would be seriously and irreparably damaged by the disclosure of trade secrets, confidential information and/or the loss or deterioration of its business strategies, employee and customer relationships and goodwill.  The Employee further understands and agrees that the foregoing makes it necessary for the protection of the business and the Company that the Employee not compete with the Company during his or her employment and for a reasonable period thereafter, as further provided in the following Paragraphs.
    (b)    The Employee acknowledges (i) that the business of the Company is global in scope and without geographical limitation and (ii) notwithstanding the jurisdiction of formation or principal office of the Company or any of its respective executives or employees (including, without limitation, the Employee), it is expected that the Company will have business activities and valuable business relationships within its industry throughout the world.  In addition, the Employee agrees and acknowledges that the potential harm to the Company of the non-enforcement of the provisions of this Agreement outweighs any potential harm to the Employee of its enforcement by injunction or otherwise.
    (c)    The Employee acknowledges that (i) he or she has carefully read this Agreement, fully understands the restraints imposed upon the Employee by this Agreement, and voluntarily agrees to its terms and conditions; (ii) he or she was not coerced to sign this Agreement and was not under duress at the time he or she signed this Agreement; (iii) by signing this Agreement, he or she will not violate the terms of any other agreement previously entered by the Employee; and (iv) prior to signing this Agreement, he or she had adequate time to consider entering into this Agreement, including, without limitation, the opportunity to discuss the terms and conditions of this Agreement, as well as its legal consequences with an attorney of his or her choice.  The Employee expressly acknowledges

and agrees that, especially given the nature and scope of the Company's business, each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area.

2. NON-COMPETITION AND NON-SOLICITATION

    (a)    The Employee will not, while an employee of the Company, and for a period of one year following the termination of his or her employment (the "Restriction Period" as further defined below), directly or indirectly, without the prior written consent of the Company:

        (i)    (A)    engage in any of the same or substantially similar activities, duties, or responsibilities that the Employee had while an employee of the Company, for any other company or business that competes with the Company, including any of the following companies or their successors: (I) Expedia and its Affiliates, including Hotels.com, Hotwire, eLong, Travelocity, Orbitz, HomeAway, CarRentals.com, Venere, Wotif and trivago; (II) lastminute.com; (III) on-line travel aggregators, including Mobissimo, Inc., Cheapflights Limited, Farechase, TripAdvisor, Skyscanner or any substantially similar on-line travel search or meta-search business; (IV) the following companies and/or businesses and their Affiliates: Ctrip, HotelTonight, HRS, Roomkey, Airbnb, Car Trawler and eDreams ODIGEO; (VI) online restaurant reservation companies or businesses and their Affiliates, including Quandoo, Bookatable and Restorando, and (VII) the on-line travel businesses of Yahoo!, Facebook, Amazon, Groupon, MSN, or Google;

        (B)    solicit or attempt to solicit any customer or client, or actively sought prospective customer or client, of the Company with respect to the businesses operated by the Company, to purchase any travel related goods or services of the type sold by the Company from anyone other than the Company; or

        (C)    assist any person or entity in any way to do, or attempt to do, anything prohibited by (A) or (B) above; or

        (ii)    (A)    solicit, recruit or hire to work for the Employee or any organization with which the Employee is connected, any employees of the Company or any persons who, within one (1) year of such solicitation, recruitment or hire, have worked for the Company;

        (B)    solicit or encourage any employee of the Company to leave the services of the Company; and

        (C)    intentionally interfere with the relationship of the Company with any person who is employed by or otherwise engaged to perform services for the Company; provided, that neither (I) the general advertisement for employees or the general solicitation of employees by a recruiter, nor (II) the Employee's being named as an employment reference for a current or former employee of the Company and responding to ordinary course inquiries made of the Employee by prospective employers of such employee in connection with such reference, shall be deemed a violation of this clause (ii).

The "Restriction Period" means the one-year period following the cessation of the Employee's employment with the Company for any reason. The Restriction Period shall be tolled during (and shall be deemed automatically extended by) any period in which the Employee is in violation of the provisions of this Section 2.

    (b)    Notwithstanding anything to the contrary contained in this Agreement, the foregoing covenant will not be deemed breached as a result of the Employee's passive ownership of less than an aggregate of 2% of any class of securities of any entity listed in

Section 2(a)(i)(A); provided, however, that such stock is listed on a U.S. national securities exchange.

(c)     If any provision or clause of this Agreement, or portion thereof, is held by any court or other tribunal of competent jurisdiction to be illegal, invalid, unreasonable, or otherwise unenforceable against the Employee, the remainder of such provision shall not be thereby affected and will be deemed to be modified to the minimum extent necessary to remain in force and effect for the longest period and largest geographic area that would not constitute such an unreasonable or unenforceable restriction.  It is the express intention of the parties that, if any court or other tribunal of competent jurisdiction construes any provision or clause of this Agreement, or portion thereof, is held by any court or other tribunal of competent jurisdiction to be illegal, invalid, unreasonable, or otherwise unenforceable against the Employee because of the duration of such provision, the scope of the subject matter, or the geographic area covered thereby, such court or tribunal shall reduce the duration, scope, or area of such provision, and, in its reduced form, such provision shall then be enforceable and be enforced.  Moreover, notwithstanding the fact that any provision of this Section 2 is determined not to be enforceable in equity, if such provision is enforceable at law, the Company will be entitled to recover monetary damages as a result of the Employee's breach of such provision.

3. NONDISCLOSURE AGREEMENT
        Simultaneously with entering into this Agreement, the Employee will enter into the Company's Employee Confidentiality and Assignment Agreement.

4. NONDISPARAGEMENT
        While an employee of the Company, and for the one-year period following cessation of the Employee's employment with the Company for any reason, the Employee shall not publicly, or in a manner that is intended to become public, make any statements, written (including electronic statements, such as via Twitter, Facebook or other social media) or oral, which disparage or defame the goodwill or reputation of the Company, or its directors or senior officers.  Notwithstanding the foregoing, nothing in this Section 4 shall prohibit the Employee from testifying truthfully in connection with a bona fide legal proceeding.

5. NOTIFICATION OF SUBSEQUENT EMPLOYER
        The Employee hereby agrees that prior to accepting employment with any other person or entity during any period during which the Employee remains subject to any of the covenants set forth in Section 2, the Employee shall provide such prospective employer with written notice of such provisions of this Agreement, with a copy of such notice delivered simultaneously to the Company.

6. REMEDIES AND INJUNCTIVE RELIEF
        The Employee acknowledges that a violation by the Employee of any of the covenants contained in Section 2, 3 or 4 would cause irreparable damage to the Company in an amount that would be material but not readily ascertainable, and that any remedy at law (including the payment of damages) would be inadequate.  Accordingly, the Employee agrees that, notwithstanding any provision of this Agreement to the contrary, the Company shall be entitled (without the necessity of showing economic loss or other actual damage) to

injunctive relief (including temporary restraining orders, preliminary injunctions and/or permanent injunctions) in any court of competent jurisdiction for any actual or threatened breach of any of the covenants set forth in Section 2, 3 or 4 in addition to any other legal or equitable remedies it may have.  The preceding sentence shall not be construed as a waiver of the rights that the Company may have for damages under this Agreement or otherwise, and all of the Company's rights shall be unrestricted.

7. CONSIDERATION

This Agreement is entered into in consideration of the Employee's employment and/or continued employment by the Company in a position where Employee will be and/or will continue to be provided and have access to the Company's confidential information, including trade secrets, which information is constantly evolving and expanding.

8. MISCELLANEOUS

(a) Notices.  All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed given to a party when (i) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid, with written confirmation of receipt); (ii) sent by facsimile with written confirmation of transmission by the transmitting equipment, provided that a copy is sent by certified mail, return receipt requested; or (iii) received or rejected by the addressee, if sent by certified mail, return receipt requested; in each case to the following addresses or facsimile numbers and marked to the attention of the individual (by name or title) designated below:

(i) if to the Company, to:
Priceline.com LLC
800 Connecticut Avenue
Norwalk, CT  06854
Attention:  General Counsel
Fax #:  203-299-8915

(ii) if to the Employee, to the Employee's address on the books and records of the Company from time to time or such other addresses as the parties may have furnished to each other pursuant to the provisions of this Section.

(b) Entire Agreement and Modification.  This Agreement supersedes all prior agreements between the parties with respect to its subject matter, and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended, supplemented or otherwise modified except by a written agreement executed by the parties.

(c) Construction.  In this Agreement, the word "including" indicates examples of a foregoing general statement and not a limitation on that general statement.  No provision of this Agreement will be interpreted for or against any party because that party or its legal representative drafted the provision.

(d) Assignments.  The Company may assign this Agreement, or any of its rights and duties hereunder, without the Employee's consent, to any subsidiary or Affiliate of the Company or to any person or entity which acquires all, or substantially all, of the assets or business of the Company or any of the Company's divisions, businesses or subsidiaries.  This

Agreement is personal to the Employee and may not be assigned or delegated by the Employee without the prior written consent of the Company, and any such attempted assignment or delegation shall be void. Subject to the foregoing, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the Employee's heirs, executors, and administrators and the Company's successors and assigns.

(e) Waiver. The parties' rights hereunder are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege hereunder will operate as a waiver of such right, power, or privilege. No single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law: (i) no claim or right arising out of this Agreement can be discharged by a party, in whole or in part, by a waiver or renunciation of the claim or right by the other party, unless in writing signed by such other party; (ii) no waiver that may be given by a party will be applicable except in the specific instance(s) for which it is given and only to the extent expressly set forth in writing and signed by such party; and (iii) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided herein. The Employee will not assert that the Company's failure, refusal to enforce, or delay in enforcing any agreement containing obligations identical or similar to those contained in this Agreement against any of its other employees or former employees constitutes, and the Employee agrees that it does not constitute, a waiver of the Company's rights hereunder.

(f) Governing Law; Jurisdiction; Service of Process. This Agreement will be governed by and construed under the laws of Connecticut without regard to conflicts of laws principles that would require the application of any other law. Any action or proceeding arising out of or relating to this Agreement may be brought in the courts of the State of Connecticut, County of Fairfield; or, if there is a basis for jurisdiction, such actions may be brought in the United States District Court for Connecticut. Each of the parties irrevocably submits to the jurisdiction of such courts in any such action or proceeding and waives any objection it may now or hereafter have to venue or convenience of forum. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

(g) Counterparts. This Agreement may be executed in one or more counterparts.

The parties have executed this Agreement on the date first written above.


Priceline.com LLC

By: *Liz Dente*
Name: Liz Dente                                             Date  12/30/2021
Title: Chief People Officer


Employee Signature: *Thomas Keen*                          Date  1/4/2022